## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SHARON HARPER, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CASE NO. CV 02-P-2689-NE |
| | } | |
| HUNTSVILLE CITY BOARD OF | } | |
| EDUCATION, et al., | } | |
| | } | |
| Defendants. | } | |

## MEMORANDUM OPINION

### I.      BACKGROUND

Pending before the court is Defendants' Motion for Summary Judgment (Doc. #11) filed on March 29, 2004.  By Order (Doc. #15) entered on June 21, 2004, the court issued a briefing schedule for the Rule 56 motion filed in this case, which provided that any summary judgment opposition from Plaintiff was due on or before July 16, 2004, and any reply by Defendants was due on or before July 26, 2004.

On July 30, 2004, Plaintiff's service copy of Doc. #15 was returned to the court as unclaimed mail.  By Order (Doc. #16) entered on August 3, 2004, the court directed the clerk to resend Doc. #15 to Plaintiff via regular mail and ordered Plaintiff to notify the court of any change of address. As of the date of this decision, the court has not received any communication from Plaintiff, much less any opposition to the pending motion.  The court's briefing schedule advised that the motion would be under submission, without oral argument, when briefing concluded.   (Doc. #15). Accordingly, the motion is properly under submission.

In her Complaint, Plaintiff maintains that Defendants discriminated and retaliated against her in violation of Title VII, § 1981, and the Americans with Disabilities Act ("ADA").   (Doc. #1). Defendants' summary judgment motion asserts that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law.   (*See generally* Doc. #11).

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R .Civ. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case,  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), that allocation scheme applies only in cases where there is no direct evidence of discrimination, *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

Under the *McDonnell Douglas/Burdine* scheme, a plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination.  Second, once the plaintiff

proves a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  Finally, if the defendant carries its burden, the plaintiff must *either* prove by a preponderance of the evidence that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* present sufficient evidence, of any type, for a reasonable jury to conclude that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision.  *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54.

## III.    STATEMENT OF FACTS[1]

On November 1, 2002, Plaintiff Sharon L. Harper filed this action in the United States District Court for the Northern District of Alabama.  (Doc. #1).  Plaintiff sued the Huntsville City Board of Education (the "Board") and Dr. Anne Roy Moore in her official capacity as the Superintendent of the Huntsville City Schools ("Superintendent Moore").  (*Id.*).  Defendants were served with this lawsuit on or about April 10, 2003.  (Doc. #2).

Plaintiff alleges that, from August 2001 until November 2002 (the date of her Complaint), the Board and Superintendent Moore subjected her to unwelcome harassment based on her race, creating a "discriminatorily abusive working environment" in violation of Title VII and 42 U.S.C. § 1981.  (Doc. #1 ¶ 12).  In addition, Plaintiff asserts that she is a qualified individual with a disability under the Americans With Disabilities Act, and that she has been harassed and

---

[1]If facts are in dispute, they are stated in the manner most favorable to Plaintiff.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  However, as Plaintiff has not opposed Defendants' statement of facts or otherwise responded to Defendants' summary judgment motion, it is appropriate for the court to treat them as admitted by Plaintiff (or at least undisputed) unless a genuine dispute of material fact is apparent from the record evidence.  The acronym "AF" stands for admitted fact.

discriminated against based on her alleged disability. (Doc. #1 ¶ 11). Finally, Plaintiff maintains that she has suffered adverse employment action in retaliation for engaging in the statutorily protected activity of filing a report of discrimination. (Doc. #1 ¶¶ 31-33).

Superintendent Moore, a black female, has held the position of superintendent for the Board since 2001. (AF No. 1). Superintendent Moore, has certain authority as the chief executive officer for the Board and also has the authority and duties set forth in Alabama Code §§ 16-21-1, *et seq.* and §§ 16-24-1, *et seq.* (AF No. 2). The Board is organized pursuant to Alabama Code § 16-11-1, *et seq.* (AF No. 3). It has the authority and duties provided by Alabama Code §§ 16-11-1, *et seq.* and §§ 16-24-1, *et seq.* (*Id.*). Pursuant to these statutes, the Board is the employer of Plaintiff and all other school employees. (*Id.*).

Johnson High School in Huntsville is one of the schools operating under the authority of Superintendent Moore and the Board. (AF No. 4). At all times relevant to her Complaint, Plaintiff was employed to teach biology at Johnson High School. (AF No. 12). Dr. Fredonia Williams, a black female, is the principal of Johnson High School. (AF No. 5). Adriane McGlathery, a black female, Al Holden, a black male, and Jimmy Blackburn, a black male, are all security officers at Johnson High School; they each testified as to their observations regarding Plaintiff. (AF No. 6). Rachel Purnell, a black female, and Robert Rice, a black male, are fellow biology teachers of Plaintiff; they each testified as to their observations regarding Plaintiff. (AF No. 7). Lorenzo Jones, a black male, was a substitute teacher, who also testified regarding Plaintiff. (AF No. 8). Gale Moseley, a white female, was the systems operator at Johnson High School. (AF No. 9). Dr. Sandra Shipman, a white female, was the Director of Secondary Education and also observed Plaintiff's performance. (AF No. 10). Shonda Malone, a black female, a science teacher at Johnson High

School testified as to her observations regarding Plaintiff's performance.  (AF No. 11).

On November 15, 2001, Dr. Williams, Johnson High School's new principal, reprimanded Plaintiff for leaving students unsupervised.[2]  (AF No. 15).  On that occasion, Plaintiff was completely unaccounted for. (AF No. 16).  Subsequently, Williams offered Plaintiff leave under the Family and Medical Leave Act, which Plaintiff took in January 2002. (AF No. 17).  Plaintiff was out on Family and Medical leave from January 3, 2002, to March 4, 2002.  (AF No. 18).

When she returned in March, rather than resuming her teaching, Plaintiff requested, pursuant to Ala. Code § 16-1-18.1, leave for an injury.  (AF No. 19).  Plaintiff filed the leave request on April 30, 2002, claiming she was "injured" on August 29, 2001, eight months earlier.  (AF No. 22). Plaintiff's only medical support for this requested leave was an August 29, 2001 letter from Dr. Celia Lloyd Turnery saying she was suffering from stress.  (AF No. 23).  Plaintiff's request for leave at that time was denied on the basis that it did not comply with the requirements of Ala. Code § 16-1-18.1. (AF No. 24).

At the beginning of the 2002-2003 school year, Plaintiff was given very specific directions by Williams: "Do not leave your class unsupervised;" "Do not leave the building without approval." (AF No. 29).  Despite these warnings, Plaintiff continued to arrive late, leave her class unsupervised, leave school, and fail to do lesson plans. (AF No. 25). In May, Plaintiff was out again, this time using sick leave.  (AF No. 26).  In fact, Plaintiff stayed out virtually all of May 2002. (AF No. 27).

---

[2]Plaintiff had been counseled before about her tardiness and failure to be in her classroom when required.  On April 10, 2000, Dr. Arthur Booker, the principal at Johnson prior to Williams, reprimanded Plaintiff and reminded her of the number of times he had spoken to her about being in her classroom on time. (AF No. 13).   Booker told Plaintiff that her "tardiness is frequent," and that her need to improve was "urgent."  (AF No. 14).

Superintendent Moore made it even clearer to Plaintiff so that she would have no misunderstanding regarding what was required of her:

> You are specifically directed to arrive at Johnson High School at the time assigned for teachers. You are further directed not to leave your class unsupervised. You are directed not to leave the building without approval of an administrator.

(AF No. 30). However, Plaintiff was late and left her classes unsupervised almost immediately after receiving Superintendent Moore's letter. (AF No. 31).

Most days Plaintiff did not arrive at school by 8:00 a.m., when school began. (AF No. 32). According to McGlathery, one of Johnson High School's security officers, Plaintiff often arrived at 8:30 a.m. or 8:45 a.m., missing both home room (when roll was supposed to be, but often was not, taken) and part of her first class. (AF No. 33). McGlathery said Plaintiff arrived after her students were in her classroom two to three times per week. (AF No. 34). Another security officer, Al Holden, said Plaintiff was late two to three times per week. (*Id.*).

On those occasions when Plaintiff was late, her students remained unsupervised unless the principal found someone, generally not a teacher, to cover for her. (AF No. 35). No one was present to give any instruction to the students when Plaintiff was late. (AF No. 36).

Lorenzo Jones, a substitute teacher, said he has had to cover for Plaintiff until approximately 10:00 a.m. (AF No. 37). Jones had no idea what course material to cover in Plaintiff's classroom because no instructions were left for him and no lesson plans were available. (AF No. 38). Even when Plaintiff knew Jones would be a substitute all day, she never left him a lesson plan. (AF No. 39). On the rare occasion when Plaintiff gave timely notice of her expected absence, she provided no lesson plans or other assistance to her substitute teachers. (AF No. 40).

6

When Plaintiff was present at school, she spent very little time in the classroom teaching her students. (AF No. 42).  A security officer, Al Holden, recalls having to stay with students while Plaintiff spoke on the phone for thirty minutes.  (AF No. 43).  Holden as well as other witnesses recall that often, Plaintiff would talk on the telephone when she was supposed to be teaching.  (AF No. 44).

Another security officer, Jimmy Blackburn, said that while Plaintiff was supposed to be teaching he saw her on the phone on several occasions.  (AF No. 45).  Blackburn said he even saw Plaintiff asleep while students were in the classroom.  (*Id.*).

After arriving late to school, Plaintiff usually left campus every day around 10:00 a.m. (after first period).  (AF No. 46).  Plaintiff said her doctor required her to be absent until 12:00 noon, resulting in a two hour absence each morning.  (AF No. 47). Thus, Plaintiff was gone every day for approximately one fourth of the school day (AF No. 48) and missed her 90 minute planning period and lunch.  (AF No. 49).  Plaintiff did not accomplish her planning at other times during the day, because she never had lesson plans.  (AF No. 50).

Plaintiff was supposed to teach a biology class beginning at 12:00 noon, but she seldom returned to the school by that time.  (AF No. 51).  After returning late, Plaintiff often did not return to the classroom.  (AF No. 52).  Instead, Plaintiff talked on the phone or went to the lunchroom to eat.  (AF No. 53).  Sometimes, Plaintiff would take her entire class to the lunchroom during scheduled instruction time, so she could eat, even though the students had eaten earlier, and even though Plaintiff had been gone during her scheduled lunch period.  (AF No. 54).

Plaintiff often left her class unsupervised.  (AF No. 55).  According to McGlathery, when Plaintiff was not in her classroom, students were often talking, out of their seats, and running in and

out of the hallway.  (AF No. 56).  Even when Plaintiff was present, witnesses observed chaos in her classroom.  (AF No. 57).  For example, Purnell testified that Plaintiff's class was completely unruly and off task.  (AF No. 58).  Malone and Holden testified that Plaintiff directed profanity to students.  (AF No. 59).

All teachers, including Plaintiff, were given portfolios setting forth important information at the beginning of each school year.  (AF No. 60).  This portfolio made clear to Plaintiff that: teachers should remain with the students they are assigned to supervise; classroom discipline was expected; assessments should occur regularly; Benchmark testing for the Alabama High School Graduation Examination ("AHSGE") was to occur first on September 3-4, 2002; she was on full-cycle evaluation; her school day ran from 8:00 to 3:10; faculty and department meetings occurred at specified times; progress reports for the first term were due September 4 and second term November 13; daily lesson plans must be completed and "easily available in [the] classroom for substitute teachers"; and teachers were to sign in and not leave the building unless an administrator signed them out.  (AF No. 61).

Science teachers also received a syllabus providing that "grading will be based on total points earned for all unit assignments including notebooks, labs, and tests" and progress reports must be mailed mid-way within each nine-week grading period.  (AF No. 62).  Teachers were to follow the pacing guides so that the material would be covered; they were to have lesson plans; they were to follow the Benchmark testing schedule; they were to do progress reports; and grading was on total points earned.  (AF No. 63).  Plaintiff made no effort to keep up with the biology course pacing guides developed in her department.  (AF No. 64).

Plaintiff's fellow biology teachers, Robert Rice and Rachel Purnell, knew that every teacher needs lesson plans, and when absent, the teacher is to leave them for the benefit of substitutes. (AF No. 65). According to Purnell, a teacher who is habitually late, does no lesson plans, fails to keep class control, stays behind in pacing guides and leaves class unsupervised is not competent. (AF No. 66).

The biggest problem with Plaintiff's continued refusal to come to work, stay at work, supervise students and teach biology was that all ninth grade students were scheduled to take the AHSGE in the Spring, and a substantial amount of information that is tested on the examination is composed of material that was supposed to be taught in Biology I. (AF No. 67). Rice and Purnell knew what was required and what should have been done to prepare for this exam. (AF No. 68). Due to Plaintiff's lack of instruction, Plaintiff's students were placed at a serious, if not fatal, disadvantage for the graduation examination. (AF No. 69). Furthermore, Plaintiff's students and their parents had no idea of the students' progress. (AF No. 70). Plaintiff simply refused to give students the required progress reports or conduct Benchmark tests. (AF No. 71). In fact, even though school began August 4, as of September 12, many of Plaintiff's students had no grades recorded at all. (AF No. 72).

On September 12, 2002, Williams reminded Plaintiff of her duty to provide progress reports, enter grades, assess students, prepare lesson plans and to give Benchmark tests for the AHSGE . (AF No. 73). Gail Moseley, Systems Operator at Johnson High School, said Plaintiff did not provide students mid-term progress reports for the first nine weeks (due September 4) or the second nine weeks (due November 13). (AF No. 74). As of September 30, 2002, Plaintiff still had entered only a few grades, still arrived late and left school without permission. (AF No. 75). When Plaintiff did

provide grades at the end of the nine week term, the grades were virtually meaningless.  (AF No. 76).

Almost no tests had been administered by Plaintiff to her students, and she failed to grade those tests she did administer.  (AF No. 77).   The majority of the grades reported by Plaintiff were either a 0 or 100. (AF No. 78).

As of October 31, 2002, Plaintiff was still leaving the school for at least two hours each day without permission, failing to supervise students, talking on the telephone during class time, refusing to meet with parents, neglecting to provide lesson plans to substitutes, arriving late, and declining to provide meaningful grades.  (AF No. 79).  Plaintiff also continued to refuse to cooperate in her evaluation. (AF No. 80).

On November 7, 2002, Plaintiff took her students in the Biology I class beginning at 12:00 noon to the lunchroom so she could eat.  (AF No. 81). Plaintiff  returned to the lunchroom at 12:43 p.m., again leaving her class unsupervised with no biology instruction occurring.  (AF No. 82). Plaintiff was behind the pacing guides.  (AF No. 83).   There were still few grades recorded.  (AF No. 84).

Williams tried again to get Plaintiff to do the job she was paid to do.  (AF No. 85).  Plaintiff continued to refuse to perform important job functions and insisted that her failure was the fault of her principal.  This caused Superintendent Moore to ask Dr. Sandra Shipman, Director of Secondary Education, to observe Plaintiff's performance.  (AF No. 86).  Shipman has been a classroom teacher, curriculum specialist, assistant principal, and Director of Secondary Education.  (AF No. 87). Shipman has observed the performance of teachers on a daily basis for much of her career.  (AF No. 88).

When Dr. Shipman observed Plaintiff on October 15, she was seven weeks behind the other biology teachers.  (AF No. 89).  On November 1, 2002, Shipman reported that Plaintiff was not prepared and was not competent when she observed her.  (AF No. 90).  Shipman testified that she had never seen a classroom teacher who performed as poorly as Plaintiff did that day.  (AF No. 91).

By November 18, 2002, Plaintiff was still arriving late, leaving her class unsupervised, missing her 12:00 noon class (she arrived at 12:50 p.m. on that day), neglecting to give progress reports, providing no biology instruction, allowing chaotic classroom conditions, refusing to cooperate in her evaluation, and permitting students to do as they pleased.  (AF No. 92).  On November 21, 2002, Plaintiff again took her classroom to lunch during instructional time.  (AF No. 93).  The next day, Plaintiff said she would not be at work until 12:00 noon (she had no leave time left), but arrived at 12:40 p.m., well into her class period.  (AF No. 94).

Plaintiff also refused to cooperate with her evaluation by preparing pre–or post–observation documents required by the State of Alabama Teacher Evaluation Procedure ("PEPE").  (AF No. 95).  She left no lesson plans and no progress reports.  (AF No. 96).  Plaintiff would not attend faculty meetings, department meetings, meetings with the principal, or parent conferences.  (AF No. 97).  Plaintiff told Williams to schedule meetings through her attorney.  (AF No. 98).

On December 9, 2002, Plaintiff was provided formal notice of the proposed cancellation of her teaching contract as required by the Alabama Teacher Tenure Act.  (HCBE Exhibit 491).  A termination hearing commenced on January 7, 2003, continued on January 14, 2003, and concluded in the early morning hours of January 15, 2003.  The Board ultimately voted to terminate Plaintiff's employment on January 16, 2003.  (*See* Minutes of January 16, 2003, Affidavit of Dr. Ann Roy Moore, Evidentiary Submission Exhibit A).  Plaintiff appealed the Board's decision to terminate her

to the Alabama State Tenure Commission and, on April 3, 2003, the Tenure Commission voted to

uphold the Board's decision.  (*See* Tenure Commission Decision, attached to Affidavit of Dr. Ann

Roy Moore, Evidentiary Submission Exhibit A).  Thereafter, Plaintiff appealed to the Circuit Court

of Madison County.  Madison County Circuit Court Judge Joseph L. Battle agreed with the decisions

of the Board and the Tenure Commission, and entered a judgment in the Board's favor on September

12, 2003.  (*See* Order, attached to Affidavit of Dr. Ann Roy Moore, Evidentiary Submission Exhibit

A).  Plaintiff appealed to the Alabama Court of Civil Appeals.  On February 19, 2004, the Court of

Civil Appeals dismissed the appeal.  (*See* Order, attached to Affidavit of Dr. Ann Roy Moore,

Evidentiary Submission Exhibit A).  The Court of Civil Appeals denied Plaintiff's application for

rehearing on March 16, 2004. (*See* Notice, attached to Affidavit of Dr. Ann Roy Moore, Evidentiary

Submission Exhibit A).[3]

## IV.    DISCUSSION

### A.    Plaintiff's Allegations of Individual Liability Under Title VII or the ADA

Plaintiff's claims against Superintendent Moore, as an individual, under Title VII and the

ADA are improper and due to be dismissed.  While Superintendent Moore is the Chief Executive

Officer of the Board who must recommend all personnel actions, the law is clear and well settled:

"Individual capacity suits under Title VII are . . . inappropriate."  *Busby v. City of Orlando*, 931 F.2d

764, 772 (11th Cir. 1991).  Indeed, "[t]he relief granted under Title VII is against the *employer*, not

individual employees whose actions would constitute a violation of the Act."  *Id*.  (emphasis in

original).  Furthermore, the Eleventh Circuit has stated that "the proper method for a plaintiff to

---

[3]Although the argument has not been made by Defendants, there is a substantial question of
whether Plaintiff's claims in this case are precluded by the final judgment rendered in her state court
action.

recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly." *Id*.   Here, Plaintiff has sued her employer, the Board, directly for alleged violations of Title VII.   In accordance with *Busby*, Plaintiff's Title VII claims against Superintendent Moore, individually, are not actionable. Consequently, Superintendent Moore is entitled to summary judgment on Plaintiff's Title VII claims against her in her individual capacity.

Similarly, with respect to the ADA, the Eleventh Circuit has held "that the disabilities act does not provide for individual liability, only for employer liability." *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996).   Thus, Plaintiff's ADA claims against Superintendent Moore in her individual capacity are also due to be dismissed.

### B.    Plaintiff's Allegations of Racial Harassment Under Title VII and § 1981[4]

Plaintiff maintains that she has been subject to unwelcome racial harassment by Defendants in violation of Title VII and § 1981.   There are no material factual disputes with respect to these claims, and Defendants are entitled to judgment as a matter of law.

The court begins with an overview of the legal framework for a racial harassment claim. Title VII provides that an employer shall not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1) (1994).   Title VII has been

---

[4]The analyses for alleged racial harassment under Title VII and § 1981 are comparable.   It is clear in the Eleventh Circuit that "[w]hen § 1981 is used as a basis for relief parallel to that provided by Title VII, the elements of a § 1981 claim are identical to the elements of a Title VII claim."   *Walters v. City of Atlanta*, 803 F.2d 1135, 1143 n.5 (11th Cir. 1986) (citing *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980)); *see also, Howard v. B. P. Oil Co., Inc.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994) (noting that *McDonnell Douglas's* burden-shifting analysis applies to actions brought under § 1981) (citation omitted).

interpreted to specifically allow claims for harassment to rest upon the theory of a hostile work environment. *See, e.g., Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

A plaintiff attempting to show that she has been subjected to a hostile work environment must prove certain elements to establish the claim. These elements include proof that: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based upon sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there exists a basis for holding the employer liable.[5] *See Henson v. City of Dundee*, 682 F.2d 897, 903-04 (11th Cir. 1982); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

In order for a plaintiff to establish a *prima facie* case of hostile work environment harassment actionable under Title VII, the incidents of harassment must be "so 'severe or pervasive' as to 'alter the conditions of employment and create an abusive working environment.'" *Faragher*, 524 U.S. at 786 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *see also Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995). Title VII is not "a general civility code" nor does it protect against "the ordinary tribulations of the workplace, such as the sporadic use of 'abusive language, gender-related jokes, and occasional teasing.'" *Faragher*, 524 U.S. at 788. Infrequent or "isolated incidents (unless extremely serious) will not amount to

---

[5]When a plaintiff fails to make the *prima facie* showing of an abusive work environment, the court need not reach the issue of employer liability. And even when the plaintiff successfully makes a *prima facie* showing of harassment involving no tangible employment action, the defendant/employer is not automatically liable.

discriminatory changes in the 'terms and conditions of employment'" sufficient to constitute a violation of Title VII.  *Id.*  The severity of the behavior must be evaluated both objectively and subjectively in light of all the circumstances,[6] *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), and, particularly in the event of an isolated incident, only the most extreme harassing conduct will be found to violate Title VII.  *See Faragher*, 524 U.S. at 788; *Oncale*, 523 U.S. at 81-82; *Meritor*, 477 U.S. at 67 ("[N]ot all workplace conduct that may be described as 'harassment' [is actionable].").

Moreover, the Supreme Court has said that the "'mere utterance of an . . . epithet which engenders offensive feelings in an employee,' does not sufficiently affect the conditions of employment to implicate Title VII." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor*, 477 U.S. at 67).  Accordingly, unpleasant comments or other unseemly conduct in the work place does not automatically rise to the level of an abusive environment in violation of Title VII.

The record before the court does not even approach the evidentiary requirements necessary to establish a *prima facie* case of hostile work environment claim.  Plaintiff's Complaint is wholly devoid of specific allegations regarding how Defendants allegedly created a hostile work environment, or treated Plaintiff in a racially harassing manner.  Plaintiff's more specific allegations are set forth in her EEOC charge attached to her Complaint:

> I was hired by the above employer in 1989 as a Teacher.  Since August 2001, I have been subjected to disparate terms and conditions of employment with respect to working conditions such as having field trips denied, loss of receipts for my field trip, deficits in my science account, being monitored more closely than other teachers, being transferred to another school without following policy and other

---

[6] "The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Mendoza*, 195 F.3d at 1246.

conditions of employment.  I have been subjected to harassment in
the performance of my job by my principal and assistant principal.
I am being disciplined unfairly by my principal and superintendent.

(Doc. #1 ¶ I at Plaintiff's EEOC Charge of Discrimination Charge No. 130A202000).  Plaintiff also

testified at her cancellation hearing regarding her supervisors' acts which she alleges to have been

harassing. (Doc. #1 at Ex. B at Vol. I. at 364, 392-93).  Even assuming the veracity of all these

allegations for summary judgment purposes, they still fall far short of the hostile work environment

threshold.

It is clear from both Plaintiff's EEOC allegations and her hearing testimony that the acts

about which she complains are nothing more than workplace reprimands, discipline and monitoring

based upon her supervisors' observations that she was not doing her job.  These type of acts simply

do not meet the hostile work environment standard.  *See Hicks v. Rubin*, 2001 WL 273831 at **2-3

(2d Cir. 2001) ( holding that "constant monitoring, negative workplace reviews, excessive reviews,

and assorted rebukes and suspensions" does not create a hostile environment, where there is no

evidence that plaintiff's supervisor's conduct is motivated by race).  Even if the reprimands and

counseling letters Williams and Superintendent Moore sent to Plaintiff could approach the necessary

threshold, the evidence is undisputed that these actions were not based on Plaintiff's race.

Nor is there any evidence that Defendants' scrutiny of Plaintiff was related to her race.

Indeed, the evidence is overwhelming that the monitoring and discipline about which Plaintiff

complains were a direct result of Plaintiff's own failure to perform her teaching duties.  Williams

and many other witnesses testified that Plaintiff continuously and repeatedly reported to work late,

left her class unsupervised, ignored the duty to input grades, neglected to give Benchmark tests,

omitted giving progress reports, did not cooperate in her evaluation, disregarded the need to provide

16

lesson plans, failed to give competent class instruction, left the building each day for long periods, declined to meet with parents, and even refused to meet with Williams.  (*See, e.g.* AF Nos. 55, 79, 92, 97).  Williams testified that she had never seen a teacher this bad.  (Doc. #13 at Ex. B at Vol. I. at 132-33).  Thus, a rational trier of fact could not reasonably conclude that Williams' written documentation of Plaintiff's numerous job-related shortcomings constitutes harassment based on Plaintiff's race.

Moreover, there is no evidence whatsoever of any racial epithets or slurs or bias by Superintendent Moore or Williams, the very individuals Plaintiff claims impermissibly harassed her. Courts have consistently entered summary judgment in favor of a defendant where there is no evidence of "a steady barrage of opprobrious racial comments."  *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1539 (10th Cir. 1995); *see also Bolden v. PRC, Inc.*, 43 F.3d 545, 551 (10th Cir. 1994); *Smith v. Beverly Health and Rehabilitation Services, Inc.*, 978 F. Supp. 1116, 1121-22 (N.D. Ga. 1997) (holding that several incidences involving racial epithets are neither individually nor collectively so severe as to alter the conditions of employment for an African-American plaintiff alleging hostile environment).  That Plaintiff has no evidence of racial slurs or discriminatory insult, intimidation or ridicule at all, is still another reason why Plaintiff's claims cannot withstand a summary judgment challenge.

### C.    Plaintiff's Allegations of Discrimination Under the ADA

Plaintiff claims that she is a qualified individual with a disability under the ADA, and that Defendants subjected her to discrimination and unwelcome harassment based upon her disability. Specifically, Plaintiff alleges that she:

> suffers from a disability in that she possesses disorders of the neurological, musculoskeletal and cardiovascular systems which impair the major life activities of walking and sleeping, and she is significantly restricted in those major life activities when compared to the average person in the general population.

(Doc. #1 ¶ 10).

However, Plaintiff's attempt to make a claim under the ADA fails for at least three reasons: (1) the evidence does not support her claim that she is disabled within the meaning of the ADA; (2) she cannot, or will not, perform the essential functions of her job as a teacher with or without reasonable accommodation; and (3) the discipline that she claims to be harassment under the ADA occurred, not because of any alleged disability, but because of her failure to perform competently as a teacher.

The ADA provides no protection to an employee unless the employee is a "qualified person with a disability." Because Plaintiff cannot show she is a "qualified person with a disability," her desire for an accommodation is misplaced. To be a "qualified person with a disability," Plaintiff must first demonstrate that she has a "disability." A "disability" means "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A).

In *Toyota Motor Manufacturing, Inc. v. Williams,* 534 U.S. 184 (2002)**,** the United States Supreme Court explained the definition of the phrase "substantially limits one or more of the major life activities of such individual." First, the impairment in question must "substantially" limit a major life activity. *Toyota*, 534 U.S. at 195. According to the Supreme Court, "substantially limits" suggests "considerable" or "to a large degree." *Toyota*, 534 U.S. at 196. The word "substantial" precludes impairments that interfere in only a minor way in major life activities. *Toyota*, 534 U.S.

18

at 197.  Merely having difficulty is not enough.  For example, the inability to see in only one eye is not a disability *per se.*   *E.g., Flores v. American Airlines, Inc.,* 184 F. Supp. 2d 1287 (S.D. Fla. 2002).

The term "major life activities," according to the Supreme Court, refers to those activities that are of central importance to daily life."  *Toyota*, 534 U.S. at 197.  In order for the activity to fit into this category – which includes basic abilities such as walking, seeing and hearing – the task or ability in question must be "central[ ]to daily life."  *Id.*; *see also Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213 (11th Cir. 2004).

Plaintiff has presented no proof at any time that she is limited to a considerable degree in activities that are centrally important to daily life.   She was asked to provide such proof, but she could not do so.   (*See* Doc. #13 at Ex. D at Ex.11).   Thus, there is no evidence that Plaintiff is disabled within the meaning of the ADA.   The EEOC regulations, as well as the *Toyota Manufacturing* case, make it clear that, if an individual wants an accommodation from her employer, it is her duty to demonstrate that she is disabled under the ADA.

Indeed, the regulations of the EEOC state that "[a]n employer may require an employee to provide documentation that is sufficient to substantiate that she/he has an ADA disability and needs the reasonable accommodation requested."  U. S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION COMPLIANCE MANUAL, "Enforcement Guidance on Disability - Related Inquires and Medical Examinations," at 12.   Such documentation is sufficient if it (1) describes the nature, severity and duration of the employee's impairment, the activity or activities that the impairment limits and the extent to which the impairment limits the employee's ability to perform the activity; and (2) substantiates why the requested reasonable accommodation is needed.  Plaintiff has provided no such

documentation to Defendants at any time.

Instead, the documentation that Plaintiff has presented to Defendants includes letters at various times that indicate that she should be in a less stressful environment (Doc. #13 at Ex. D. at Ex. 1); she has an "illness related to stress/anxiety/depression caused by work conditions." (Doc. #13 at Ex. D. at Ex. 3); she has ongoing job related stress and anxiety (Doc. #13 at Ex. D. at Ex. 4); and she has "depression, anxiety, DJD, HPB, insomnia." (Doc. #13 at Ex. D. at Ex. 5). Another letter states that she must be given the opportunity to leave the school grounds "for medical reasons." (Doc. #13 at Ex. D. at Ex.7). Still another letter indicates that "she needs to decrease the amount of paperwork and time restraints for completion of paperwork due to ongoing job stress and anxiety" and that she must be able to leave the campus. (Doc. #13 at Ex. D. at Ex. 9). In October 2002, a doctor wrote that Plaintiff has "neurological, musculoskeletal, cardiovascular problems, acute depression, anxiety, hypertension, DJD, and insomnia aggravated by stress." (Doc. #13 at Ex. D. at Ex.13).

Although Plaintiff may very well have significant stress, anxiety, and depression problems, the ADA requires a much greater showing to be classified as disabled. For example, the letters noted above do not suggest that Plaintiff is substantially impaired in performing activities that are "of central importance to daily life." Instead, Plaintiff's own doctor says she has the type of difficulties which many people face daily, including anxiety, job-related stress, and hypertension. (Doc. #13 at Ex. D. at Exs. 3-4, 9). These are certainly problematic conditions. However, legally, they are not disabilities and, therefore, do not require accommodation. *See Davis v. BellSouth Mobility, LLC*, No. CV 01-AR-0986-S, 2002 WL 31720597 (N.D. Ala. Nov. 1, 2002). In *Davis*, the plaintiff attempted to characterize hemorrhoids, which are "commonly suffered by millions of Americans,"

as a disability.  The Eleventh Circuit held that "[t]o characterize such a common malady as hemorrhoids, even severe hemorrhoids, as a disability would thwart the purpose of the ADA." *Davis*, 2002 WL 31720597, at *4.

Similarly, Plaintiff attempts to characterize as a disability her alleged stress and anxiety, which are widespread conditions commonly suffered by many to varying degrees.  Similar to the litigant in *Davis*, to characterize Plaintiff as disabled because she suffers from stress and anxiety "would thwart the purpose of the ADA."  Plaintiff has not shown that she is substantially impaired in performing activities of central importance to daily life, and the ADA does not apply to her.  "An employee's ability to handle reasonably necessary stress and work reasonably well with others are essential functions of any position.  Absence of such skills prevents the employee from being 'otherwise qualified.'"  *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002) *citing Palmer v. Circuit Crt. of Cook Cty.,* 117 F.3d 351 (7th Cir.1997); *Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 674-75 (1st Cir.1995); *Pesterfield v. Tennessee Valley Auth.,* 941 F.2d 437, 441-42 (6th Cir.1991); *Weigert v. Georgetown Univ.,* 120 F. Supp. 2d 1, 14 (D.D.C. 2000) ("[T]echnical skills and experience are not the only essential requirements of a job and [ ] stability and the ability to interact with co-workers constitutes an essential function.").

In addition to her inability to show that she is disabled, Plaintiff has not shown how her requested accommodation would help relieve her stress and anxiety.  Plaintiff requested an accommodation of leaving school daily from 10:00 a.m. until 12:00 noon.  But Plaintiff never made any effort to show why leaving the school each day for two hours would help to alleviate the supposed negative effects of her conditions by helping her arrive at school on a timely basis, teach, supervise, and otherwise have a positive impact on her students.  Nor did she make any effort to

present the required proof regarding these matters.  She did not even call her own doctor as a witness at her termination hearing, and perhaps for good reason.  Dr. Turney, the doctor who signed several of Plaintiff's records, told Superintendent Moore that Plaintiff was not disabled.  (Doc. #13 at Ex. B at Vol. II at 576).

As it turns out, Plaintiff wound up taking the accommodation and left school daily from 10:00 a.m. to 12:00 noon, even though Superintendent Moore denied her permission to do this.  (Doc. #13 at Ex. B at Vol. II at 352-53, 365).  Thus, Plaintiff gave herself the accommodation she sought.  Even though she had the two hour break with pay she wanted, Plaintiff still did not show up for work on time; she did not plan her lessons; she still did not supervise her students; her students were far behind the other classes; she still did not provide assessment of the students; she still did not attend various meetings that she was supposed to attend; and, finally, she was consistently insubordinate to Superintendent Moore and her principal.  Thus, even with the reasonable accommodation that Plaintiff wanted, she did not perform the essential functions of her job.

Plaintiff is not protected by the ADA for at least one other reason as well.  In order to be "a qualified person with a disability," Plaintiff must be able to perform the "essential functions" of her job with or without reasonable accommodation.  Thus, even assuming she is disabled, Plaintiff is not "a qualified person with a disability" if she cannot or will not perform the essential functions of her job as a teacher.  42 U.S.C. § 12111(8).

Regular and reliable level of attendance at work has been deemed an essential job function. *Tyndall v. National Education Centers, Inc.*, 31 F.3d 209, 213 (4th Cir. 1994).  More specifically, the Seventh Circuit has held that regular attendance is an essential function of a school teacher's job.

22

*Nowak v. St. Rita High School*, 142 F.3d 999, 1003 (7th Cir. 1998).   Not only is regular attendance an essential job function, but also so is punctuality.   In fact, according to the Eleventh Circuit, even when a plaintiff is disabled, termination for excessive tardiness does not violate the ADA.   *Earl v. Mervyns, Inc.,* 207 F.3d 1361, 1367 (11th Cir. 2000).

The essential job functions of a teacher as established by Defendants are:  (1) showing up for work; (2) punctuality in showing up for work so that students may be taught; (3) supervising students; (4) planning lessons for students; (5) teaching students; (6) providing assessment of student performance; (7) attending meetings with parents; (8) attending planning meetings with other teachers; (9) attending meetings with the principal; and (10) following directions of the principal and Superintendent Moore.  (Doc. #13 at Ex. B at Vol. I at 162-64).  Even a cursory review of the Rule 56 record establishes that Plaintiff was unable or unwilling to perform any of these essential job functions.   She was habitually late.   She talked on the phone rather than taught.   She did not supervise students.   She did not assess students' progress.   She missed or refused to have meetings.   She was routinely insubordinate.

Plaintiff's ADA claim fails for causation reasons, also.   Even assuming Plaintiff is a qualified person with a disability, the ADA does not prohibit all adverse action against the disabled.   Instead it prohibits adverse actions taken because of the person's disability.   The actions about which Plaintiff complains (*e.g.*, reprimands, disciplinary letters) were taken because she was <u>not</u> doing her job, not because of any alleged disability.

For example, courts have granted summary judgment in favor of employers when the type of actions about which a plaintiff complained did not rise to the level supporting the existence of a hostile work environment or harassment under the ADA. *See Trepka v. Board of Education*, 28 Fed.

Appx. 455, 461-62, 2002 WL 104801 (6th Cir. 2002) (affirming district court on ADA harassment claim and pointing out that principal's alleged conduct relating to teacher, who suffered from myofacial pain syndrome, of requiring teacher to knock snow from boots before entering building, asking teacher to sit on floor with class during assembly, and not responding quickly to a panic buzzer that teacher pressed, is not sufficient evidence from which reasonable jury could conclude harassment because of teacher's disability as opposed to other plausible reasons such as personal dislike); *Stedman v. Bizmart, Inc.*, 219 F. Supp. 2d 1212, 1223 (N.D. Ala. 2002) (holding that supervisor's actions in asking employee a question in front of group of people and showing disgust when employee did not know answer to question, asking employee in loud voice if he had completed certain projects, timing employee on his ability to finish computer entry, and stating that he was not going to be responsible for affecting someone's health are neither related to disability nor sufficiently severe or pervasive to support a hostile work environment claim under ADA); *see also Keever v. City of Middleton*, 145 F.3d 809, 813 (6th Cir.), *cert. denied*, 525 U.S. 963 (1998) (affirming findings of lower court and pointing out that conversations between employee and superiors about employee's job performance do not constitute hostile work environment just because they cause distress to employee).

In summary, Plaintiff cannot show: (1) she suffered from a (real or perceived) disability; (2) she was entitled to an accommodation; (3) she was denied a reasonable accommodation; or (4) she was discriminated against in violation of the ADA.   Accordingly, Defendants are entitled to summary judgment on her ADA claims.

### D.      Plaintiff's Allegations of Retaliation

Plaintiff's Complaint does not specifically describe the adverse conduct upon which Plaintiff

maintains gives rise to a retaliation claim, nor does it identify under which statute she is bringing the claim, *i.e.*, Title VII, § 1981, the ADA.  Plaintiff asserts in Count V of her Complaint that she "engaged in statutorily protected expression by filing reports of discrimination and by opposing defendants [sic] unlawful employment practices."  (Doc. #1 ¶ 31).  Plaintiff further alleges that she "suffered an adverse employment action."  (Doc. #1 ¶ 32).

"To establish a *prima facie* case of retaliation, a plaintiff must show:  (1) a statutorily protected expression; (2) adverse employment action; and (3) a causal link between the protected expression and the adverse action."  *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997).  Regardless of Plaintiff's ability to adequately establish a *prima facie* case of retaliation with respect to either reprimands, monitoring, and reviews or her discharge, the court is convinced that Defendants have presented a plethora of overwhelming and compelling evidence of legitimate reasons for their treatment of Plaintiff, and Plaintiff has no evidence of pretext.  The record is replete with evidence to support the reasons for Superintendent Moore's recommendation to cancel Plaintiff's teaching contract and the Board's decision to vote in favor of the recommendation.  Therefore, Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

## V.  CONCLUSION

For all of the reasons set forth above, the court finds that no material facts are in dispute, and Defendants are entitled to judgment as a matter of law.  Accordingly, the court will enter an order granting Defendants' Motion for Summary Judgment and dismissing Plaintiff's Complaint with prejudice.

**DONE** and **ORDERED** this _____4th_____ day of February, 2005.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE